## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

**ANGELA ANDERSON,**

  **Plaintiff,**

  **v.**             **Case No. 16-CV-2038-JAR**

**EQUIFAX INFORMATION SERVICES LLC,**


  **Defendant.**

---

## MEMORANDUM AND ORDER

  Plaintiff Angela Anderson filed suit against Defendant Equifax Information Services LLC alleging violations of the Fair Credit Report Act ("FCRA").[1]  Specifically, Plaintiff alleges Defendant merged her credit file with that of another consumer, sold consumer credit reports that included false accounts and information, and failed to remove false accounts and information in response to Plaintiff's numerous requests.  This matter comes before the Court on Defendant's Motion for Summary Judgment (Doc. 36) and Defendant's Motion to Exclude or Limit the Testimony of Plaintiff's Expert, Evan Hendricks (Doc. 38).  The motions are fully briefed, and the Court is prepared to rule.  For the reasons explained more fully below, Defendant's Motion for Summary Judgment is granted and Defendant's Motion to Exclude or Limit the Testimony of Plaintiff's Expert Evan Hendricks is moot.

### I.  Legal Standard

  Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[2]  In

---

[1] 15 U.S.C. § 1681.

[2] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[3]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[4]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[6]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[8]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[9]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[10]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a

---

[3] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[4] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[5] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[6] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[7] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[8] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[9] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[10] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

rational trier of fact could find for the nonmovant."[11]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[12]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[13]

## II.     Factual Background

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff.

### A.     Defendant Equifax and Its Procedures

Defendant is a credit reporting agency as defined by the FCRA.  In accordance with the FCRA, Defendant maintains detailed procedures to: (1) assure maximum possible accuracy of information it reports to its subscribers regarding consumers, (2) conduct reasonable reinvestigations to determine whether disputed information is inaccurate, and (3) limit the furnishing of consumer reports to persons which it has reason to believe has a permissible purpose.

Defendant initially creates consumer credit files by using identifying information that it receives from a data furnisher.  Defendant may make changes to a consumer's file as a result of three circumstances: (1) periodic batch processing of bulk data; (2) a data furnisher's out-of-cycle update to address circumstances or changes specific to individual consumers; or (3) through the application of business rules in accordance with federal and state law, or in

---

[11] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[12] *Adams*, 233 F.3d at 1246.

[13] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

accordance with internal Equifax business policies (e.g. the deletion of derogatory information after seven years per federal law).

Defendant's processing of bulk data—which contains information regarding numerous consumers from a single data furnisher—results in the vast majority of updates to consumer credit files.  On a monthly basis, Defendant processes approximately 1.2 billion bulk data updates from thousands of data furnishers.  Before bulk data is uploaded into Defendant's consumer database, it is subjected to a variety of tests designed to determine the data's integrity and overall quality, and to standardize updates to the format used by Defendant.  This process is referred to as "data quality assurance."

Defendant subjects the data to quality assurance, and then uploads the data to its consumer database, which processes the data using a sophisticated and proprietary algorithm that matches new information to existing consumer credit files.  If no credit file exists, Defendant creates a new file for the consumer.  This process is known as the "Search/Match Process." Defendant uses the same Search/Match process when a creditor—or some other entity with a permissible purpose for obtaining a credit report—requests a credit report.  Defendant also uses this process when consumer-service agents assist consumers making disputes.  Defendant uses this sophisticated process to match consumer information for several reasons: there are variations in identifying information provided by furnishers and creditors; there are variations in identifying information provided by consumers; and there are inevitable human errors in the data-entry process.

The Search/Match Process uses thirteen elements of personal identifying information, and all 8,192 possible combinations of those elements, to arrive at a match.  The elements are (in no particular order): (1) last name; (2) first name; (3) middle name or initial; (4) suffix, such as

Jr. or Sr.; (5) gender; (6) street number; (7) street name; (8) date of birth; (9) city and zip code; (10) Social Security number "equal"; (11) Social Security number "maybe"; (12) age; and (13) account number.  Defendant uses all thirteen elements to assess the quality of a match; it performs a calculation of matched elements versus mismatched elements versus missing elements.  Defendant will not consider information to be a match unless there are at least three "strong" pieces of matching information.  Defendant assesses strength using a comparison control table that assigns a numerical value to the various possible element combinations.

A Social Security number is a "strong" piece of matching information because each number is generally assigned to only one individual, who keeps that number for life.  A Social Security number is also a private piece of information that is usually not widely known to persons other than the Social Security number holder.  Not all data furnishers and credit-report users, however, provide a Social Security number.  Defendant does not require an exact match of all nine digits of a Social Security number before matching an account to a consumer's credit file.  Defendant considers "maybe" matches when eight of nine digits match, and in some cases, when seven of nine digits match.  It does so because it is not unusual for Social Security numbers to be transcribed incorrectly (such as mistaking a "4" for a "9") or for numbers to be inadvertently transposed (such as "96" rather than "69").

Defendant also does not require an exact match of all other available elements because the personal circumstances of consumers can change.  For example, consumers can change their names (e.g. through marriage or divorce), and move to new locations, both near or far.  Consumers may also use more than one address (e.g. a home street address and a post office box or office address) and may use a nickname or middle name for some purpose and a first name for other purposes.  Unintentional misspelling or miskeying of consumer information further

complicates the match process.  Many common names, for example, have more than one spelling.  Address numbers and dates of birth are also prone to the same transcription errors described above with Social Security numbers.  Consumers may also purposely use an incorrect date of birth.

   If Defendant were to require an exact match of all consumer information, Defendant would then possess "fragmented files."  Fragmented files come about when information regarding a single consumer ends up in multiple files.  If Defendant required exact matches of all or some of the elements, it would not be able to combine any of the multiple files, which would leave Defendant (and creditors) without a complete picture of the consumer's credit history.  This would reduce the reliability of consumer reports and ultimately hurt consumers.

   On the other hand, a matching process that allows for too many variations in matching elements can lead to the opposite problem known as "mixed files."  File mixing occurs when information belonging to two consumers is combined into a single consumer file.  Given the fluctuations in consumer information described above and the inevitable human errors associated with data input, a perfect file-matching process is not possible.  The goal, rather, is to keep the number of mixed and fragmented files at a minimum and to develop processes for correcting mixed and fragmented files when they occur.

   **B.**     **Plaintiff's File Combined With Angela Bierman-Bogart's File**

   Plaintiff (formerly known as Angela Miles) and Angela Bierman-Bogart (formerly known as Angela Bierman) both reside in Kansas and have social security numbers that match on eight out of nine digits.[14]  In July 2004, the name Angela P. Anderson-Miles became

---

[14] Plaintiff attempted to controvert the fact that she and Bierman-Bogart do not have similar social security numbers.  However, in the exhibit that she offers to contradict the fact that eight of nine digits match, there are only four digits for each woman's social security number offered.  Thus, this exhibit does not contradict the evidence Defendant presented.

associated with the credit file for Angela Bierman-Bogart.  The source of the information was a new Chase account posted to the Angela Bierman-Bogart file.

In September 2004, as part of a quarterly update, Defendant's computer merged the two files into one because of the matching name, state of residence, and almost identical social security numbers.  Defendant has changed its online combine procedures since September 2004, and the merge of the two files would not happen today.  Defendant flags a Social Security number as a "verified" Social Security number when it is reported to Defendant on three or more independent updates from data providers.  The updated matching rules no longer allow two files with verified Social Security numbers that differ to combine.

In March 2005, Plaintiff first discovered that her credit file information was mixed with Angela Bierman-Bogart's information when she refinanced her mortgage.  Plaintiff obtained a trimerge[15] mortgage credit report on March 10, 2005, that contained information regarding Angela Bierman-Bogart.  Plaintiff alleges that an Equifax representative told her at that time that "there was a glitch in the computer," that she was merged with an Angela Bogart," and that she had "multiple files."  Anderson does not have any notes or recordings of that conversation and does not remember the name of anyone she spoke to or the exact date of that conversation.

Plaintiff's credit file was not owned by Defendant until December 2012, but rather was owned by another consumer reporting agency, CSC Credit Services, Inc. ("CSC"), that stored its information in Defendant's database.  Defendant did not acquire CSC until December 2012.  Plaintiff claims that she disputed the information with Defendant in writing in the March 2005 timeframe, but does not have a copy of that correspondence.  On January 24, 2006, Anderson

---

[15] A trimerge report is a report containing information from all three national consumer reporting agencies.

contacted CSC, not Equifax, to dispute information.  Defendant does not maintain records of disputes for more than five years.

On February 13, 2006, Plaintiff obtained a disclosure from CSC that included information that belonged to Angela Bierman-Bogart.  On June 29, 2011, Anderson obtained a credit report through Capital One, and it included accounts on her Equifax report that did not belong to her.

### C.    Plaintiff's Contacts With Defendant

Since 2004, Plaintiff claims she has pled with Defendant (or CSC) to fix her credit report. In the last five to six years, Plaintiff has been blocked from receiving her own Equifax credit report because she was unable to answer Angela Bierman-Bogart's security questions.  When Plaintiff called Defendant to fix the issue, she was told they could not help her over the phone because she could not prove her own identity.  Plaintiff could not access her credit report online, and therefore had difficulty disputing the items on her credit report.

Around June 2011, Plaintiff subscribed to Capital One's credit monitoring service in the hope of potentially fixing the mixed credit file problem with Defendant.  In late 2011, Defendant stopped providing the reports to Capital One.  In 2013, Capital One ended the service and stopped helping fix the merged credit file.[16]  Plaintiff did not know what steps to take at that point to fix the report since all of her previous attempts had failed.

In 2015, Plaintiff learned that new false accounts and information had begun appearing in her Equifax credit reports.  Plaintiff learned this during the process of refinancing her mortgage through Citibank.  Because Plaintiff's file was mixed, Angela Bierman-Bogart's debts were showing up on Plaintiff's credit report.  Plaintiff's August 31, 2015 credit report included a

---

[16] Defendant objects to this statement as hearsay.  The Court overrules this objection because Plaintiff submitted evidence that her final report was dated March 24, 2013.  This is non-hearsay evidence that Defendant discontinued credit monitoring services.

Barclays Bank Delaware account (opened in March 7, 2014), a Bennington State Bank account (opened in July 10, 2014), a Citicards CBNA account (opened in January 9, 2014), and an address at 520 South 19th Street Salina, Kansas 67401 (reported in August 2015).

Plaintiff disputed these newly appearing accounts and information in 2015.  Plaintiff claims that throughout 2015 she "repeatedly wrote" to Defendant asking it to correct her report so that she could qualify for a mortgage.  Plaintiff also claims that she called Defendant six to seven times between August 2015 and November 2015.  Plaintiff does not have records of most of the contacts.  Plaintiff has no copies of any letters that she mailed to Defendant.

Plaintiff submitted a refinancing application to Citibank for her mortgage on or around August 17, 2015.  Even though Plaintiff was an existing Citibank customer, she had to explain that her credit file was mixed with Angela Bierman-Bogart's file.  On August 17, 2015, Plaintiff called Citibank to discuss refinancing her mortgage and spoke to Waymon Williams.  Plaintiff explained the situation with her Equifax report.[17]  Over the weekend of August 21, 2015, Plaintiff received a "welcome" packet in the mail from Citibank that contained a mortgage application and the credit files they obtained from three credit bureaus.[18]  Once again it showed that Defendant was reporting Angela Bierman-Bogart's personal information and credit on Plaintiff's credit report.

---

[17] The Court sustains Defendant's objection to hearsay as to the statements of Citibank employee Waymon Williams, who did not submit an affidavit.  *See* Doc. 44 ¶¶ 11–13; Doc. 48 ¶¶ 11–13 There is no applicable exception to the hearsay rule applicable.  *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010) ("[I]t is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment" and noting that "[h]ad [the plaintiff] followed the expedient contemplated by Rule 56 and secured sworn statements from those who allegedly heard [the remarks], this case might be in a very different posture") (citation omitted); *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) ("Under our precedents, we are constrained to disregard such hearsay on summary judgment when, as here, there is a proper objection to its use and the proponent of the testimony can direct us to no applicable exception to the hearsay rule.").

[18] The Court overrules Defendant's objection to hearsay as to the contents of the Citibank packet.  The form of evidence submitted at summary judgment was Plaintiff's affidavit as to the packet.  However, assuming the packet could be obtained for trial, the packet would be admissible under the business records exception.  *Johnson*, 594 F.3d at 1210 (holding that while the form of evidence produced by nonmoving party at summary judgment may not need to be admissible at trial, content or substance of the evidence must be admissible).

On August 21, 2015, Plaintiff called Defendant and spoke to Defendant's associate named Orlando, who told her that he did not know anything about a refinance or Citibank's request for an Equifax credit report. Plaintiff explained the merged credit file situation to Orlando. Orlando tried to walk her through the merged credit report line-by-line, which took nearly a half an hour. Plaintiff disputed what she could over the phone, but she could not dispute each item as Orlando would not give her any specifics due to security issues.

On August 24, 2015, Plaintiff called Defendant again. The representative she spoke to over the phone was argumentative and kept telling Plaintiff that her name was Angela Bogart and that she was not Angela Anderson. Plaintiff also tried to explain to her the merged file history leading up to that phone conversation. The representative told Plaintiff that she didn't have a record of the dispute or Plaintiff's conversation with Orlando. The representative told Plaintiff she needed to fax a copy of her driver's license and social security card to 888-826-0573. This call lasted approximately ten to fifteen minutes. The phone conversation and lack of knowledge of recent disputes concerned Plaintiff. She was worried about the ability to refinance her house, so Plaintiff again reached out to Citibank employee Waymon Williams.[19]

On August 26, 2015, Defendant received a fax from Plaintiff related to her August 21 phone call. In the faxed letter, Plaintiff did not dispute any specific accounts. She only stated that she attached proof of her ID to add to her August 21 phone dispute: "I am sending to you a copy of my social security card and driver's license as requested from a phone conversation that

---

[19] Defendant submits the affidavit of Alicia Fluellen, Operation Strategist at Equifax, who denies this conversation. Doc. 37-1 ¶ 43. Defendant submitted Fluellen's statement that Equifax only had record of one telephone dispute on August 21, 2015 from Plaintiff.

I had with one of your associates . . . ."[20]  During this process, Plaintiff spoke to Waymon Williams about her options regarding attempted refinancing.[21]

On September 4, 2015, Plaintiff went to Defendant's "online dispute" website to find out the status of her dispute.  After entering her information, Plaintiff got the message: "The information you provided does not match our records so we are unable to process your request online.  Please FAX your dispute and a copy of your driver's license to 888-826-0549."  Defendant received another fax from Plaintiff on September 4, 2015, and started its second reinvestigation.  Plaintiff's fax stated that she was "sending a copy of her social security card and driver's license, as requested from your website when I tried to get an update on my dispute claim which was faxed . . . on August 26, 2015."[22]  The fax stated she disputed six accounts and three pieces of ID information.  Defendant opened an ACIS case.

On September 9, 2015, Plaintiff received a 54-page credit report dated August 31, 2015.  Defendant replaced Plaintiff's information with Angela Bierman-Bogart's information.  Defendant deleted her Citibank mortgage, but other false accounts remained.  On September 10, 2015, Plaintiff called Defendant.  She explained that she had sent numerous copies of identification and faxed letters and had just received a report in the mail and Defendant had made her merged credit file worse.  The representative commented to Plaintiff that they only received Plaintiff's fax dated September 4, 2015, and had no record of a dispute before that date.  Plaintiff told her that she did not think that was true since the credit report was date August 31, 2015.  The representative put Plaintiff on hold several times and told her she would be transferred to the escalation department, but she then told Plaintiff that they could not speak with her on the phone

---

[20] Doc. 37-1 ¶ 47.

[21] The Court sustains Defendant's objection to hearsay as to Waymon Williams's statements.  *See supra* note 21.

[22] *Id.* ¶ 49.

and they would continue investigating the dispute.  Plaintiff needed to close on her refinance in mid-October.  The representative told Ms. Anderson that it could take longer to investigate the dispute.  The phone call had already lasted for 45 minutes.

On September 12, 2015, Defendant completed reinvestigation on the first dispute from August 21.  Defendant reinvestigated eighteen accounts, deleted seven accounts, and verified eleven accounts.  On or about September 14, 2015, before Defendant completed its second reinvestigation, Angela Bierman-Bogart also contacted Defendant.  On or about September 14, 2015, Defendant's agent separated the files and created a new file for Angela Bierman-Bogart.  She also moved the six disputed accounts to that file.  At the time that Defendant completed the maintenance of separating the two files, five accounts remained on Plaintiff's file that did not belong to her and one incorrect address.

On October 7, 2015, Plaintiff checked Defendant's "online dispute" website for the new case number Defendant provided on September 10, 2015.  The website stated that the case was opened on September 4, was completed on October 6, and the results had already been put in the mail.  Plaintiff called Defendant on October 15, 2015.  She was told her credit file was not masked and "a lot of things are still under investigation."  Defendant had no record of the dispute being completed or mailed.

October 7 was the last interaction Plaintiff had with Defendant.  Plaintiff never received verification via email or postal mail that showed Defendant completed the dispute or corrected her credit report.  Plaintiff did not know her Equifax credit file had supposedly been corrected until she gave her deposition for this case in the fall of 2016—about nine months after the filing of this lawsuit—when Defendant's attorney represented that her credit report had been corrected.

During the five years preceding the filing of the Complaint on January 19, 2016, Defendant claims Plaintiff only actually made the telephonic dispute on August 21 and the faxes related to that call on August 26 and September 4.

**D.      Chase Home Lending Inquiry**

The inquiry section of Plaintiff's August 31, 2015 credit report showed that Defendant provided information to "Chase Home Lending" for an "account review" on August 18, 2015. Plaintiff did not have an account with Chase Home Lending which would need to be reviewed. The inquiry section of her credit report is separated into two sections.  The upper section lists hard inquiries—companies that request a credit file with whom the consumer has applied for a loan or credit.  The lower section lists soft inquires—inquiries which display only to the consumer and are not considered when evaluating credit worthiness for example requests from employers, companies making promotional offers and a consumer's own request to check credit. The "Chase Home Lending" account review was listed in the soft inquiry section.  The only information provided to Chase Home Lending on the inquiry dated August 18, 2015 was the consumer's name and address and that Defendant's customer made a mortgage inquiry on her file on August 17, 2015.

**E.      Plaintiff's Damages**

Plaintiff seeks actual, statutory, and punitive damages from Defendant.   In December 2008, Plaintiff sought an auto loan with Credit Union of Johnson County, now Main Street Credit Union, but was denied because of accounts that did not belong to her.  Plaintiff obtained the car loan with her soon to be ex-husband as a co-signer.

In the fall of 2013, she was denied a loan of approximately $2,500 to $3,800 for the purchase of an air conditioner.  Plaintiff has no documents related to the application and did not

see an Equifax credit report provided on this application, but she believes that the denial was based on an Equifax credit report.

In April 2014, she was denied an Amazon credit card by Chase Bank.  Chase Bank obtained Defendant's credit information exclusively from Defendant.[23]  Plaintiff intended to use the credit to purchase textbooks.  Plaintiff admits that she was able to obtain the textbooks through other means.

Defendant caused her to be delayed in a mortgage refinance application with Citibank. Defendant claims that she refinanced in the fall of 2015 to lower her interest rate and because her ex-husband demanded to be removed from the loan.  She began the refinancing process in August 2015.  While refinancing, she was constantly worried about the Equifax situation. Plaintiff spent less time with her children, her sleeping and eating patterns were disrupted, and the quality of her work was affected and compromised.  The stress caused by the Citibank refinance caused her to break out in hives all over her body, and angioderma caused her face, tongue, and abdomen to swell in November 2015.  She ultimately received refinancing in November 2015.  Plaintiff obtained the best available interest rate.[24]

Plaintiff states that the basis for her claim for punitive damages is that she felt like Defendant did not do anything despite her calls and letters, admitted there was an issue of a merged file and a computer glitch, and then either failed to respond or removed incorrect information when she faxed letters.

---

[23] Defendant objects to this statement as hearsay.  The Court overrules the objection because Plaintiff attached a document from Chase to Plaintiff stating that their decision to deny the credit card application was based on information provided by Defendant.  Doc. 44-1 at 72.  This document is subject to the business records exception to the hearsay rule.  *See* Fed. R. Evid. 803(6).

[24] Plaintiff did not properly controvert this fact.  She offered no evidence that the interest rate available could have been lower.  Further, she admitted in testimony that she received the best interest rate available.

III.     **Discussion**

A.     **FCRA Provisions**

This case concerns three substantive provisions of the FRCA—15 U.S.C. § 1681b(a), 15

U.S.C. § 1681e(b), and 15 U.S.C. § 1681i—as well as the FRCA's statute of limitations and

statute of repose—15 U.S.C. § 1681p.

Section 1681e(b) concerns a credit reporting agency's obligation to follow reasonable

procedures to assure maximum accuracy in credit reporting.  In relevant part, it states that

"[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable

procedures to assure maximum possible accuracy of the information concerning the individual

about whom the report relates."   This provision is sometimes called the "maximum possible

accuracy" provision of the FCRA.

Section 1681i concerns the steps that a consumer reporting agency must take if a

consumer complains about information in his or her file.  In relevant part, it states that "if the

completeness or accuracy of any item of information contained in a consumer's file at a

consumer reporting agency is disputed by the consumer," the credit reporting agency must

"conduct a reasonable reinvestigation to determine whether the dispute information is inaccurate

and record the current status of the disputed information, or delete the item from the file . . . ."

This provision is sometimes called the "reasonable reinvestigation" provision of the FCRA.

Section 1681b provides when a credit reporting agency may provide a consumer report to

a customer.  In relevant part, it states that "any consumer reporting agency may furnish a

consumer report under the following circumstances and no other: . . . (3) To a person which it

has reason to believe—(A) intends to use the information in connection with a credit transaction

involving the consumer on whom the information is to be furnished and involving the extension

of credit to, or review or collection of an account of, the consumer . . . ."  This provision is sometimes called the "permissible purpose" provision of the FCRA.

The FCRA also contains a two-year statute of limitations and a five-year statute of repose in 15 U.S.C. § 1681p.  It states in relevant part that "[a]n action to enforce any liability created under this subchapter must be brought . . . not later than the earlier of—(1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or (2) 5 years after the date on which the violation that is the basis for such liability occurs."

### B.      Grounds for Summary Judgment

Defendant moves for summary judgment in its favor on four grounds.  First, Defendant argues the FCRA's statute of limitations bars Plaintiff's claims.  Second, Defendant argues Plaintiff was not damaged by Defendant's alleged violations of the FCRA.  Third, Defendant is entitled to summary judgment on Plaintiff's § 1681b permissible purpose violation because she has adduced no triable evidence to support it.  Fourth, Defendant is entitled to summary judgment on Plaintiff's claim that Defendant willfully violated the FCRA.

The Court agrees with Defendant that the § 1681b(a) maximum possible accuracy and § 1681e(b) reasonable reinvestigation claims are time barred.  Further, the Court agrees with Defendant that summary judgment on Plaintiff's § 1681b permissible purpose violation must be granted in its favor because Defendant did not provide a consumer report within the meaning of the statute.  Thus, the Court will reach only those two issues.

### 1.      Statute of Limitations for FCRA Claims

The issue before the Court is whether the FCRA's statute of limitations under § 1681p runs from the date Plaintiff originally discovered the FCRA violation or from the date of

republication of erroneous credit information or re-report by Plaintiff of allegedly false information.[25]  Section 1681p provides a time limit for claims brought under the FCRA:

> An action to enforce any liability created under this subchapter may be brought . . . not later than the earlier of—
> (1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or
> (2) 5 years after the date on which the violation that is the basis for such liability occurs.[26]

Each of the two counts in the Complaint allege Defendant violated three separate provisions of the FCRA relating to the investigative and reporting duties for credit reporting agencies.  Specifically, § 1681e(b) requires a credit reporting agency to follow reasonable procedures to ensure maximum accuracy, § 1681i requires a credit reporting agency to comply with reinvestigation requirements, and § 1681b requires a credit reporting agency to provide a consumer's credit file to companies only once it has determined there is a permissible purpose.  Count I alleges negligent violations and Count II alleges willful violations.

It is undisputed that Plaintiff's file was first merged with Angela Bierman-Bogart's file in 2004.  All of the alleged violations stem from the mixing of Plaintiff's file with Angela Bierman-Bogart's file other than Defendant allegedly providing Plaintiff's consumer report to Chase Home Lending with no permissible purpose in 2015.  Further, it is undisputed that in March 2005, Plaintiff first discovered that she was mixed with Angela Bierman-Bogart when she

---

[25] In response to the statute of limitations argument, Plaintiff argues whether Defendant was a proper party in 2004 or any time prior to 2012 is a question of fact for the jury to decide.  Defendant submitted evidence that it merged Plaintiff's credit file with that of Angela Bierman-Bogart in 2004, it did not own Plaintiff's credit file in 2004, and CSC owned the credit file until 2012.  Plaintiff cites no case law to support this argument.  The Court could not find where Defendant responded to such argument.

Courts have found that a credit reporting agency that does not own or maintain the plaintiff's credit file is still a proper party.  *Gohman v. Equifax Info. Servs., LLC*, 395 F. Supp. 2d 822, 826 n.3 (D. Minn. 2005) (declining to hold that Equifax is not subject to section 1681e because it does not own or maintain plaintiff's file).  It is undisputed that while CSC owned the file, it was stored on Defendant's database.   Therefore, the Court finds Defendant is a proper party as early as 2004.

[26] 15 U.S.C. § 1681p.

refinanced her mortgage.  Plaintiff obtained a trimerge mortgage credit report on March 10, 2005, that contained information regarding Angela Bierman-Bogart.  Plaintiff alleges that an Equifax representative told her at that time that "there was a glitch in the computer," that she was merged with an Angela Bogart," and that she had "multiple files."  It is undisputed that Plaintiff disputed the information with Defendant in writing around March 2005.  Plaintiff filed suit on January 19, 2016.  The question, therefore, is whether the statute of limitations began to run in March 2005 when she first discovered her file was mixed with Angela Bierman-Bogart's file and reported it to Defendant, or in 2015 when she subsequently re-reported the erroneous credit information and Defendant continued to republish the information.

Although the Tenth Circuit has not addressed the issue, there is a split of authority among the federal courts considering the statute of limitations for claims alleging violations under the FCRA.  Plaintiff relies on the Fifth Circuit's decision in *Hyde v. Hibernia National Bank in Jefferson Parish* for the proposition that each issuance of a credit report constitutes a "separate and distinct tort to which a separate statute of limitations applies."[27]  In *Hyde*, the Fifth Circuit reasoned that in cases where the same credit information is misreported multiple times, the "failure of the consumer to mitigate his damages by filing suit when he is first injured, thus permitting a more widespread circulation of the credit information, should have bearing only on the calculation of damages."[28]  Thus, the defendant's second issuance of plaintiff's credit report was held to be a discrete event triggering a new statute of limitations.[29]  Several courts have followed *Hyde*'s reasoning and holding.[30]

---

[27] 861 F.2d 446, 450 (5th Cir. 1988).

[28] *Id.* at 450.

[29] *Id.* at 449.

[30] *See, e.g.*, *Campbell v. Chase Manhattan Bank, USA, N.A.*, No. Civ. A. 02-3489, 2005 WL 1514221, at *11 n.5 (D.N.J. June 27, 2005); *Lawrence v. Trans Union LLC*, 296 F. Supp. 2d 582, 587 (E.D. Pa. 2003).

Extending the holding in *Hyde*, a number of courts have also held that each failure to conduct a reasonable investigation in response to a dispute restarts the limitations period for FCRA claims.[31]  For example, in *Marcinski v. RBS Citizens Bank*, the plaintiff alleged the defendant violated the FCRA by failing to conduct an adequate investigation, reporting inaccurate information, and failing to notify the credit reporting agency of inaccurate information.[32]  The court denied the defendant bank's motion to dismiss the FCRA claims against it as untimely and held: "[g]iven the FCRA's language, as well as its purpose, each alleged failure of [d]efendants to comply with their FCRA obligation constitutes a separate FCRA violation, even though the violations stem from the same allegedly false or inaccurate credit information."[33]  Thus, although the plaintiff in *Marcinski* discovered in 2010 that his credit report had erroneous information, his 2013 suit was not untimely because he filed subsequent disputes about the erroneous information in 2013.[34]

By contrast, there are a number of courts that hold additional dispute reports or additional republication of erroneous credit reports based on the same erroneous information previously

---

[31] *See, e.g.*, *Maiteki v. Marten Transp. Ltd.*, 4 F. Supp. 3d 1249, 1253–54 (D. Colo. 2013) ("[E]ach re-report of allegedly false information triggers a new duty to conduct a reasonable investigation, which in turn restarts the limitations period for an FCRA claim based on the failure to conduct a reasonable investigation."); *Young v. LVNV Funding LLC*, No. 12-CV-1180, 2013 WL 4551722, at *3 (E.D. Mo. Aug. 28, 2013) ("[E]ach re-report of inaccurate information, and each failure to conduct a reasonable investigation in response to a dispute, is a separate FCRA violation subject to its own statute of limitations."); *Baratto v. Citizens Auto. Fin., Inc.*, No. 11-105, 2011 WL 3678676, at *5 (D. Minn. Aug. 1, 2011) (holding violations occur every time a consumer submits a dispute to a credit reporting agency or lender and that entity does not respond as directed by the statute); *Broccuto v. Experian Info. Sols. Inc.*, No. 07-CV-782, 2008 WL 1969222, at *4 (E.D. Va. May 6, 2008) ("The statute's construction creates a violation every time a consumer submits a dispute to a credit reporting agency and that agency or the relevant lender does not respond to the complaint as directed by the statute.  The fact that the account or transactions questioned in the instant dispute may have also been the subject of a previous dispute does not mitigate the obligations of the bank or credit reporting agency to take the actions."); *Larson v. Ford Credit*, No. 06-CV-1811, 2007 WL 1875989, at *4 (D. Minn. June 28, 2007) (holding that each subsequently submitted complaint started a new statute of limitations for FCRA purposes; a new violation occurred if the defendant in that case indeed failed to properly investigate each time).

[32] 36 F. Supp. 3d 286, 288 (S.D.N.Y. 2014).

[33] *Id.* at 290.

[34] *Id.* at 289–90.

discovered cannot restart the limitations clock.[35]  For example, in *Bittick v. Experian Information Solutions, Inc.*, the plaintiff discovered inaccuracies in her credit report in 2001, and she filed suit in 2005.[36]  Despite additional reports to the credit reporting agency post-2003, the district court held the plaintiff's maximum possible accuracy and reasonable reinvestigation claims were time barred.[37]  The court held that subsequent dispute letters regarding the same erroneous information cannot restart the limitations clock because "[t]o do so would allow [a plaintiff] to indefinitely extend the limitations period by simply sending another complaint letter to the credit reporting agency."[38]

In *Brown v. Equifax Inc.*, this district addressed the statute of limitations for FCRA claims.[39]  In *Brown*, the plaintiff discovered in 2011 that the defendants were incorrectly reporting a foreclosure instead of a deed in lieu of foreclosure on her credit report, which she reported.[40]  In June 2011, the problem was fixed, but the foreclosure designation re-appeared in July 2011.[41]  In September 2011, the plaintiff re-submitted her dispute, and in February 2012, the foreclosure designation was removed again.[42]  However, in September 2012, the foreclosure

---

[35] *See, e.g.*, *Benjamin v. Experian Info. Sols., Inc.*, 14-810, 2014 WL 3509044, at *2 (D. Minn. July 14, 2014); *Mack v. Equable Ascent Fin., LLC*, No. 11-CV-793, 2013 WL 183646, at *5 (E.D. Tex. Jan. 17, 2013); *Hatten v. Experian Info. Sols., Inc.*, No. 12-12236, 2013 WL 5179190, at *4 (E.D. Mich. Sept. 12, 2013); *Edwards v. Ocwen Fed. Bank, FSB*, No. CIV.A 08-317, 2010 WL 398902, at *5 (D.N.J. Jan. 25, 2010); *Hancock v. Charter One Mortg.*, No. 07-15118, 2008 WL 2246042, at *2 (E.D. Mich. May 30, 2008); *Blackwell v. Capital One Bank*, No. 606-CV-066, 2008 WL 793476, at *3 (S.D. Ga. Mar. 25, 2008); *Bittick v. Experian Info. Sols., Inc.*, 419 F. Supp. 2d  917, 919 (N.D. Tex. 2006); *Waggoner v. Trans Union, LLC*, NO. 02-CV-1494G, 2003 WL 2220668, at *5 (N.D. Tex. July 17, 2003).

[36] 419 F. Supp. 2d at 918.

[37] *Id.* at 919.

[38] *Id.*

[39] No. 13-2373, 2013 WL 5769925 (D. Kan. Oct. 24, 2013).

[40] *Id.* at *1.

[41] *Id.*

[42] *Id.*

designation re-appeared.[43]  The plaintiff filed suit in July 2013.[44]  The Court found the case

distinguishable from *Hyde* or *Bittick* on the facts, so it decided not to bless either approach.[45]

Rather, it found the claims were not time barred because "the plaintiff's credit report was

initially corrected as a result of her dispute but that the inaccurate information was re-reported

during the limitations period; that new, incorrect information was reported during the limitations

period; and that she suffered injuries during the limitations period as a result of credit denials."[46]

The Court finds this matter distinguishable from *Brown*.  Whereas in *Brown* the plaintiff

had her credit report fixed twice and had to re-dispute when the error came back, Plaintiff here

does not allege that her file was completely unmerged from Angela Bierman-Bogart's file and

corrected.[47]  Plaintiff alleges that beginning in 2004, her file was merged with Angela Bierman-

Bogart's file and she has not been able to get the matter corrected despite filing disputes starting

in 2005.  Plaintiff alleges she did not know the Equifax credit file had supposedly been corrected

until she gave her deposition for this case in the fall of 2016—about nine months after the filing

of this lawsuit—when Defendant's attorney represented that her credit report had been corrected.

Thus, the Court cannot follow the approach taken in *Brown*, and allow the statute of limitations

period to begin each time erroneous credit information was corrected, put back on the credit

report, and re-disputed.

The Court, therefore, finds the decision whether to follow the *Hyde* or *Bittick* approach

unavoidable, and  agrees with the approach taken in *Bittick* rather than the approach in *Hyde*, for

---

[43] *Id.*

[44] *Id.*

[45] *Id.* at *3.

[46] *Id.* at *4.

[47] There is evidence that Defendant corrected disputed accounts belonging to Angela Bierman-Bogart on August 31, 2015, September 12, 2015, and September 14, 2015.  However, there was no evidence submitted that on any of these dates, Plaintiff had a corrected credit report.  Rather, at least some of Angela Bierman-Bogart's information always remained on Plaintiff's report.

several reasons  First, *Hyde*, which was decided in 1988, is based on a previous version of §

1681p.[48]  Second, to allow a plaintiff to extend the limitations period with each subsequent

dispute or with each republication of an erroneous credit report based on the same error would

extend the limitations period indefinitely.  For example, a plaintiff could discover that an

erroneous mortgage was listed on his or her credit report, repeatedly dispute the mortgage, and if

the credit reporting agency fails to reinvestigate and correct the error, the cycle could continue

perpetually without the limitations period ever running.[49]  Third, if Congress intended that a

plaintiff be allowed to extend the limitations period with each subsequent dispute or

republication of an erroneous credit report, it would have stated so in the statute.  The statute

reads that the limitations period runs "2 years after the date of discovery by the plaintiff of the

violation that is the basis for such liability."  This plain language of the statute requires the claim

to accrue upon discovery of the violation—here the merger of her file with Angela Bierman-

Bogart and the failure to investigate the dispute.

    Based on the approach in *Bittick*, Plaintiff's claims for maximum possible accuracy and

reasonable reinvestigation are time barred.  Once Plaintiff discovered her file was mixed with

Angela Bierman-Bogart's file in 2005, began disputing the file in March 2005, and Defendant

failed to conduct a reasonable reinvestigation, Plaintiff had two years to bring her action.  Her

limitations period ran in March 2007 on the maximum possible accuracy and reasonable

---

[48] Congress amended the limitations section of the FCRA in 2003 to include the discovery provision; the amendment became effective in 2004.  *See* P.L. 108–159 § 2; 15 U.S.C. § 1681p (1998; Supp. 2007); *Sweitzer v. Am. Express Centurion Bank*, 554 F. Supp. 2d 788, 794 n.2 (S.D. Ohio 2008).  Before the amendment, § 1681p required that a claim be brought "within two years from the date on which the liability ar[ose]." *Deaton v. Chevy Chase Bank*, 157 F. App'x 23, 24 (9th Cir. 2005).  This Court, in considering the 2003 amendment, has found that "the prior version is more restrictive of what conduct can form the basis for plaintiff's claims."  *Tilley v. Global Payments, Inc.*, 603 F. Supp. 2d 1314, 1323 (D. Kan. 2009).

[49] "[T]he primary purpose of statutes of limitations is to promote fairness to defendants by preventing prosecution of stale claims and the loss of relevant evidence and by encouraging diligence by plaintiffs."  *Emp'rs Reinsurance Corp. v. Swan*, No. 91-2459, 1993 WL 339061 (D. Kan. Aug. 17, 1993) (citing *Farrell v. Automobile Club of Michigan*, 870 F.2d 1129, 1134 (6th Cir.1989);  *Burnett v. N.Y. Central R.R. Co.*, 380 U.S. 424, 428 (1964)).

reinvestigation claims stemming from her file mix with Angela Bierman-Bogart.  Rather, she inexplicably waited until 2016, more than ten years after discovery, too file suit, which is well outside of the statute of limitations.

The Court finds this case similar to two cases cited by Defendant that also followed the approach in *Bittick*.  In *Hancock v. Charter One Mortgage*, the plaintiffs disputed the balance and pay status of a mortgage reported on their credit report.[50]  The plaintiffs sent multiple dispute letters regarding the mortgage until the credit report was corrected in June 2006.[51]  The district court found that the plaintiffs knew of the errors on their credit report more than two years before they filed suit.[52]  The district court held the plaintiffs' claims were time barred because "[the plaintiff's] subsequent dispute letters regarding the same erroneous information do not restart the statute of limitations clock."[53]

Like in *Hancock*, Plaintiff repeatedly disputed her file being mixed with Angela Bierman-Bogart's file, since 2004 or 2005.  Her file was not corrected until October 2016.  Plaintiff knew in 2005 her file had been mixed with Angela Bierman-Bogart's file.  Plaintiff cites the erroneous inclusion of a Barclays Bank Delaware account (opened in March 7, 2014), a Bennington State Bank account (opened in July 10, 2014), a Citicards CBNA account (opened in January 9, 2014), and an address at 520 South 19th Street Salina, Kansas 67401 (reported in August 2015).  But, it is of no consequence that new accounts and information linked to Angela Bierman-Bogart were added during 2015.   For they are still linked to the same error Plaintiff began alleging in 2004 or 2005—her file merge with Angela Bierman-Bogart.  Plaintiff's

---

[50] 07-15118, 2008 WL 2246042, at *1 (E.D. Mich. May 30, 2008).

[51] *Id.*

[52] *Id.* at *3.

[53] *Id.*

subsequent dispute letters or Defendant's republication of erroneous credit reports related to Angela Bierman-Bogart's information do not restart the statute of limitations.

And, in *Blackwell v. Capital One Bank*, the plaintiff brought maximum possible accuracy and reasonable reinvestigation claims stemming from the defendant reporting a delinquent credit card account belonging to her ex-husband.[54]  The plaintiff submitted a complaint with the credit reporting agency, and the defendant responded that the information was accurate.[55]  The plaintiff re-reported the debt, and the defendant again responded the information was correct.[56]  The plaintiff agreed her claim based on the first dispute was time barred, but she argued that the statute of limitations on the second dispute started a new clock.[57]  The district court rejected the plaintiff's contention that the defendant committed new violations with regards to her additional complaints and thus restarted the limitations clock.[58]  Rather, the district court followed the approach in *Bittick* and held the additional complaints regarding the same inaccurate information did not restart the limitations clock.[59]

Here, like in *Blackwell*, Plaintiff repeatedly disputed the credit reporting agency mixing her file with Angela Bierman-Bogart's file; and Defendant never fully corrected that error.  But, the statute of limitations does not run from the time of the subsequent disputes and reinvestigations of the same alleged error—namely, her file mix with Angela Bierman-Bogart.  Rather, following the approach in *Blackwell*, her statute of limitations began to run from the first dispute and investigation in 2004 or 2005.

---

[54] No. 06-CV-066, 2008 WL 793476, at *1 (S.D. Ga. Mar. 25, 2008).

[55] *Id.*

[56] *Id.*

[57] *Id.* at *2.

[58] *Id.*

[59] Id.

Plaintiff raises two additional arguments to extend the statute of limitations for her maximum possible accuracy and reasonable reinvestigation claims.  First, Plaintiff argues Defendant withheld or concealed her credit report in 2010 because she kept failing security questions to obtain the report.  But that did not extend the statute of limitations because the fact remains that she learned of the file merge with Angela Bierman-Bogart in 2005, which is the violation she disputes. That claim expired in 2007 before she began to have access issues.  It is not of consequence that in 2010 she could not obtain her credit report because this does not change the fact that she discovered and disputed her file mix in 2005.

Second, Plaintiff argues that the limitations period did not begin to run until she was aware that Defendant's procedures were unreasonable.  Following this logic, she argues she could not have discovered Defendant had an unreasonable procedure because the procedures were proprietary.  She cites *Andrews v. Equifax Information Services LLC*[60] and *Drew v. Equifax Information Services LLC*[61] for the proposition that the statute of limitations does not run until the consumer discovers whether the applicable procedures were reasonable.  The Court finds these cases inapplicable to this case.

In *Andrews*, the plaintiff took a similar position as the one suggested here.  The district court noted that "Equifax does not explain how, from the information it sent, Plaintiff could discern whether the company's procedures in ensuring accuracy or reinvestigating her dispute were reasonable, indicating a violation of §§ 1681e(b) or 1681i(b)."[62]  The court found that the FCRA was not a strict liability statute, so the court suggested a plaintiff might need to uncover more than just an error on his or her credit report before discovering the basis of an FCRA

---

[60] 700 F. Supp. 2d 1276 (W.D. Wash. 2010).

[61] 690 F.3d 1100 (9th Cir. 2012).

[62] 700 F. Supp. 2d at 1279.

claim.[63]  The court, however, also noted "[m]ore importantly, Equifax did not adequately support its assertion that Plaintiff received its reports, and thereby 'discovered' the alleged violations."[64] Thus, in *Andrews*, unlike in this case, there was no evidence that the plaintiff had received the erroneous credit report.  Accordingly, the court's language about the reasonableness of the credit reporting agency's practices was dicta.[65]  It is not binding or persuasive to this Court.

In *Drew*, the issue was whether the plaintiff's claim accrued before June 2004.  There, the defendant argued that it accrued earlier than June 2004 because the plaintiff had received collections calls in April and May of that year on the account.[66]  The defendant argued these calls would have made the plaintiff aware that its investigation was complete and that it believed the debt was legitimate.[67]  The Ninth Circuit disagreed noting that although the defendant was making collection calls, it never informed the plaintiff its investigation was complete.[68]  To start the limitations period, the defendant had to show not just that the debt was erroneous, but the defendant "had failed to comply with its duties under the FCRA, in particular, its duty to investigate."[69]  The act of trying to collect a debt was not enough notice that the defendant failed to meet the reasonableness standard.[70]  *Drew*, however, is not on point because of the facts described above, as well as the fact that it involved a claim under § 1681s-2(b) against a furnisher of information.[71]

---

[63] *Id.*

[64] *Id.*

[65] *Verkuilen v. Business Info. Grp., Inc.*, No. 14-400, 2016 WL 1677190, at *4 (E.D. Wis. Apr. 26, 2016).

[66] 690 F.3d at 1109.

[67] *Id.* at 1110.

[68] *Id.*

[69] *Id.*

[70] *Id.* at 1111.

[71] *Verkuilen*, 2016 WL 1677190, at *3 (distinguishing a similar argument from *Drew* because as the defendant pointed out, in § 1681s-2(b) claims "the consumer is largely out of the loop because the furnisher's

Although Plaintiff is correct that § 1681p is triggered by discovery of the claim, Plaintiff takes the concept of discovery too far in arguing that she must be aware of the reasonableness of Defendant's procedures before the limitations period begins running.  Few consumers would ever get information about the reasonableness of a credit reporting agency's internal procedures before a lawsuit is filed.[72]  Rather, internal policies often come to light through the discovery process.  The statute of limitations in § 1681p would be almost meaningless if the Court construed the limitations period as Plaintiff suggests because the limitations period would seldom accrue until after the lawsuit was even filed.  Thus, the Court disagrees that the clock does not run until Plaintiff discovers whether the procedures are reasonable.

## 2.    Permissible Purpose Claim

Plaintiff's permissible purpose claim is unrelated to the file mixing with Angela Bierman-Bogart.  Plaintiff alleges the inquiry section of her August 31, 2015 credit report showed that Defendant provided information to Chase Home Lending for an "account review" on August 18, 2015.  Plaintiff did not have an account with Chase Home Lending which would need to be reviewed.  Therefore, the discovery of this violation was in August 31, 2015, so the statute of limitations began to run at that time.  This claim, therefore, is timely.

While the permissible purpose claim is timely, the information Defendant provided Chase Home Lending is not a consumer report within the definition of the statute.  The FCRA statutory provision creating the permissible purpose claim states in relevant part that "any consumer reporting agency may furnish a consumer report under the following circumstances and no other:

---

obligation to investigate is triggered not by the consumer but by a notification from the reporting agency.  Thus, without being told so explicitly, a consumer would have no reason to question (either way) the reasonableness of a furnisher's investigation, and neither would the consumer be expected to know if the investigation were complete.").

[72] *Id.* at *2 (taking the approach that "[w]hen a plaintiff alerts the agency, twice, to a relatively simple error (the reporting of a dismissed criminal case), and the company fails to correct it, such a plaintiff will have, ipso facto, reasonable grounds to allege that agency's procedures are unreasonable.").

. . . (3) To a person which it has reason to believe—(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer . . . ."[73]  In § 1681a(d)(1), consumer report is defined as

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for--
> (A) credit or insurance to be used primarily for personal, family, or household purposes;
> (B) employment purposes; or
> (C) any other purpose authorized under section 1681b of this title.

The information furnished to Chase Home Lending was not a consumer report within the definition under § 1681a(d)(1).  The inquiry section of Plaintiff's credit report was separated into two sections.  The upper section listed hard inquiries—companies that request a credit file with whom the consumer has applied for a loan or credit.  The lower section listed soft inquires—inquiries which display only to the consumer and are not considered when evaluating credit worthiness for example requests from employers, companies making promotional offers, and a consumer's own request to check credit.  The Chase Home Lending account review was listed in the soft inquiry section.  The only information provided to Chase Home Lending on the inquiry dated August 18, 2015, was the consumer's name and address and that Defendant's customer made a mortgage inquiry on her file on August 17, 2015.  This information was not used or expected to be used to determine eligibility for credit.

**IV.     Conclusion**

---

[73] 15 U.S.C. § 1681b(a)(3)(A).

Plaintiff's maximum possible accuracy and reasonable reinvestigation claims are time-barred under the FCRA § 1681p.  Defendant did not provide a consumer report within the meaning of the statute for Plaintiff's permissible purpose claim.  Lastly, because summary judgment is granted on all claims, the Court does not reach Defendant's Motion to Exclude or Limit the Testimony of Plaintiff's Expert, Evan Hendricks, because the motion is moot.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 36) is **granted**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude or Limit the Testimony of Plaintiff's Expert, Evan Hendricks (Doc. 38) is **moot**.

**IT IS SO ORDERED.**

Dated: August 3, 2017

                                        S/ Julie A. Robinson
                                        JULIE A. ROBINSON
                                        UNITED STATES DISTRICT JUDGE